In Re DEAK & CO., INC., et al., Debtor.

DEAK & CO., INC., Plaintiff,

v.

Ir. R.M.P. SOEDJONO, a/k/a Dama, Defendant.

Bankruptcy No. 84 B 11680.
Adv. No. 85–6788A.

United States Bankruptcy Court, S.D. New York.

July 24, 1986.

As Amended July 24, 1986.

Levin & Weintraub & Crames by Herbert S. Edelman, Cindy Ellen Tzerman, New York City, for debtor.

Anderson, Russell, Kill & Olick, P.C. by Arthur S. Olick, Laurence Y. Solarsh, New York City, for Creditors Committee.

Fox, Glynn & Melamed by John R. Horan, Richard N. Chassin, New York City, for Ir. R.M.P. Soedjono a/k/a DAMA.

Milbank, Tweed, Hadley & McCloy by Risa Rosenberg, New York City, for Chan Cher Boon.

Harold D. Jones, by John Campo, New York City, U.S. trustee.

Davis, Polk & Wardwell by Laureen Bedell, New York City, for Morgan Guar. Bank.

Howard, Darby & Levin by Jack P. Levin, Jerome C. Roth, New York City, for Carol Sui-Han Leo.

## DECISION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS COMPLAINT

BURTON R. LIFLAND, Bankruptcy Judge.

At all times relevant herein the debtor, Deak & Co., Inc. ("Deak") and its affiliates, were heavily engaged in the trading of international currency and gold. When Deak filed its Chapter 11 petition under the Bankruptcy Reform Act of 1978 ("Code") in 1984, creditors and other parties in interest worldwide were affected. Throughout the ensuing and often contentious reorganization, which has culminated in a confirmed plan, challenges to this court's jurisdiction rarely surfaced. However, one Ir. R.M.P. Soedjono a/k/a DAMA ("DAMA"), a defendant in an adversary proceeding commenced by Deak, did raise a jurisdictional challenge, which is the subject of this decision.

In the proceeding against DAMA, Deak seeks to invalidate a pledge claimed by DAMA on 8,000 shares of stock in Foreign Commerce Bank ("FOCO"), a bank located in Zurich, Switzerland and substantially owned and controlled at all material times by the debtor. Deak claims that the pledge constitutes a preference and a fraudulent conveyance which is voidable under the Code and New York Debtor and Creditor Law. In its amended complaint, Deak also seeks to enjoin DAMA from prosecuting an action instituted by DAMA in a Zurich District Court to enforce his alleged pledge. DAMA has moved to dismiss the instant proceeding, contending that this court lacks jurisdiction over him.

## I. FACTS

The DAMA pledge, the relationship between DAMA and Deak, and DAMA's contacts with this court are set forth in detail below because they form the foundation for this court's holding. The pledge claimed by DAMA ("pledge" or "alleged pledge") has its roots in an earlier transaction between DAMA and a Deak affiliate. DAMA maintained an account or accounts at Deak-Perera Finance, Ltd. or Deak-Perera Far East, Ltd., two non-debtor affiliates of Deak located in Hong Kong, prior to the time Deak filed its petition for reorganization. DAMA purchased international certificates of deposit from one or both of these affiliates. When a certificate of deposit for approximately U.S. $4,000,000 matured on June 29, 1984, DAMA invested these proceeds with another Deak affiliate, Deak & Co. (Macau) Ltd. ("Deak Macau"), a non-debtor partnership organized under the laws of Portuguese Macau. In exchange, Deak Macau issued an international certificate of deposit for approximately U.S. $4,000,000 to DAMA.

Deak Macau did not secure or collateralize the certificate of deposit issued to DAMA. However, the Board of Directors of Deak, the parent company, adopted a resolution in New York on July 27, 1984, authorizing a pledge of 8,000 of Deak's FOCO shares to DAMA even though the underlying obligation was that of Deak Macau. Deak allegedly pledged the 8,000 shares to DAMA sometime in October of 1984.

On December 6, 1984, Deak and two of its wholly-owned subsidiaries, Deak-Perera International Banking Corporation and Deak-Perera Wall Street, Inc., filed petitions for reorganization in the Bankruptcy Court for the Southern District of New York.[1] The debtors asserted that the filings were, in large part, a response to the worldwide decline in the value of foreign currency in relation to the increasing strength of the U.S. dollar. This decline resulted in large losses for Deak and its subsidiaries on their foreign currency inventory and in reductions in earnings generated by their foreign exchange business. Deak saw its principal asset, its interest in

---

1. Pursuant to §§ 1107 and 1108 of the Code, the debtors have continued in the possession and management of their assets and properties as debtors in possession.

the capital stock of FOCO, decreasing in value. As part of its reorganization efforts and attempts to provide creditors with the greatest distribution possible, it was concluded that everyone's best interests would be served if Deak sold its interest in FOCO.

Deak had attempted to sell its FOCO shares prior to the bankruptcy filing and had negotiated toward a purchase agreement with Dow Banking Corporation ("Dow"). The terms of the agreement were not finalized until after the filing and thus became subject to the approval of the bankruptcy court and to higher and better offers. Higher offers were made and were evaluated by a European investment banker retained to help market the FOCO shares.

On July 6, 1985, Deak entered into a Stock Purchase Agreement for the FOCO shares ("Agreement") with an individual named Chan Cher Boon ("Chan"), on behalf of his then undisclosed principal Carol Sui-Han Leo ("Leo"). Of the 100,000 shares of FOCO stock which were issued and outstanding when the petition was filed, Deak owned 82,478 and was deemed to own an additional 12,644 for a total of 95,122 shares (collectively the "FOCO shares"). The Agreement provided that Chan on behalf of Leo would acquire all of Deak's shares or approximately 95% of the capital stock of FOCO for a purchase price equivalent to U.S. $52,000,000.[2] Section 4(a) of the Agreement provided that Leo would acquire the shares of FOCO "free and clear of all interests of any other entity including all liens, claims and encumbrances of any nature whatsoever," notwithstanding the parties' knowledge of DAMA's claim.

On February 11, 1985, just two months after Deak filed its petition, DAMA through his attorneys Fox Glynn & Melamed filed a notice of appearance and request for all notices and other papers. The notice states:

PLEASE TAKE NOTICE that the undersigned appear for M.P. SOEDJONO

[DAMA], Scheveningen, Holland, *a party in interest and equity security holder in these proceedings* and pursuant to Bankruptcy Rule 2002(f) and (g) request that all notices and other papers in these proceedings be mailed or delivered to:
FOX GLYNN & MELAMED
One Broadway
New York, New York 10004
(Emphasis added).

Pursuant to his request, DAMA received, *inter alia,* actual notice of the hearing on Deak's application for an order approving the Agreement scheduled for August 6, 1985. *See Affidavit of Service to Notice of Hearing to Consider Approval of Stock Purchase Agreement,* filed July 17, 1985, listing Fox Glynn & Melamed, counsel for DAMA, as having been served on July 16, 1985. DAMA did not file an objection to or otherwise contest the allegations made in Deak's application, although his interest in the DAMA shares was clearly sought to be affected.

At the August 6th hearing, Deak alleged that DAMA's pledge and two others claimed by the Hong Kong receiver of Deak-Perera Far East Limited and one of the Deak debtors, Deak-Perera International Banking Corporation, were in bona fide dispute and that these parties could be compelled to accept a money satisfaction of their security interest in the FOCO shares. Deak stated on the record that "[b]y selling for the highest price available we believe that the attachment of their liens to the proceeds of sale give them the indubitable equivalent of what they otherwise have a lien on." Transcript, August 6, 1985, at 19. Deak further stated that it was "aware of no objection by any of the three lienors [one of whom was DAMA] with respect to this prong of the application." *Id.* Deak contends, and it has not been contradicted, that DAMA's counsel was present in court, although he neither objected nor formally noted his appearance on the record. *Debtor's Memorandum in Opposition to*

---

2. The purchase price was subsequently increased to U.S. $58,000,000. *See* Amendment to

Stock Purchase Agreement at 3.

*DAMA's Motion to Dismiss* at 3–4. The Hong Kong receiver (represented by counsel), who like DAMA claimed to have a pledge, stated that "on the present state of this record, and I am adverting to the remarks made by [the debtor and the Creditors Committee] with regard to the existence of the dispute as to all liens which will attach to the proceeds, I am withdrawing [my] objections [to the sale of the shares]." Transcript, Aug. 6, 1985, at 90.

This court, after hearing and considering the papers and arguments presented, entered an order pursuant to §§ 363(b) and (f) of the Code authorizing the sale of all of Deak's interest in the FOCO shares, including the DAMA pledge.[3] The order mirrored the language of the Agreement by ordering that the sale be "free and clear of all liens, claims, pledges, and other encumbrances (collectively the "Liens")," and added that the "Liens shall attach to the proceeds of such sale with the same force, validity and effect which they now have against the FOCO shares." *Order Approving Stock Purchase Agreement and Granting Other Relief* at 5. The order also provided that FOCO was to deliver the FOCO shares to Chan. *Order* at 5. These provisions, in part, were designed to protect DAMA from any prejudice which could result from the sale.

Nevertheless, immediately after this court issued its August 6, 1985 order, but before the actual closing of the Agreement in Switzerland or the physical transfer of the FOCO shares, DAMA with knowledge of these proceedings and premised upon his alleged pledge, sought and obtained *ex parte* an injunction from a Swiss District Court in Zurich restraining FOCO from transferring the DAMA shares to Chan. Because Deak, Chan and Leo desired the transaction to close promptly to prevent further diminution in the value of the FOCO shares, they entered into an escrow arrangement. It provides that:

We hereby further agree that any funds expended by us will not be paid out of current funds or assets of Deak or of any of its affiliates or subsidiaries, but will be paid out of the fund created by a portion of the purchase price paid by [Chan] for the FOCO shares, which fund shall be placed in an escrow account (the "Escrow Account") held by Morgan Guaranty Trust Co. of New York as escrow agent, in the amount of U.S. $5,260,000 ... being approximately equal to the aggregate of (i) the pro rata value in U.S. dollars of the shares against which a claim is asserted by Soedjono [DAMA] based on the purchase price paid by Chan for the 95.122[%] shares; and (ii) ten percent (10%) of such value in U.S. dollars.

Pursuant to the terms of the escrow agreement, FOCO is holding the DAMA shares in Switzerland, and Morgan Guaranty Trust Company is holding the funds in an interest bearing account in New York pending final resolution of the DAMA pledge controversy. The Swiss court injunction expressly prohibited physical transfer of the DAMA shares to Chan at the closing of the Agreement, but Deak did transfer title to Chan as Leo's agent in accordance with the provisions of the Agreement. As Leo's agent and on her instructions, Chan transferred title to the 8,000 shares in question to Leo's Swiss counsel, Dr. Ulrich Meierhaus, in whose name the DAMA shares are registered, to be released only upon joint instructions of Leo's representative and DAMA or upon an order of a court of competent jurisdiction. On August 6, 1985, DAMA also commenced an action for declaratory and other relief in Switzerland against Deak and FOCO, the stake holder of the DAMA shares, to establish the validity of DAMA's pledge.

DAMA continued to receive papers and attend hearings in New York. At a No-

---

**3.** The urgency for the sale of the FOCO shares was also communicated to this court by the Swiss Banking Commission. Transcript, Aug. 6, 1985, at 27; *see* Court's Exhibit 1, at 2 (Aug. 6, 1985 hearing). The Commission, recognizing the pendency of the sale under the aegis of this court stated that unless the sale took place, FOCO's license might be withdrawn. Court's Exhibit 1, at 2 (Aug. 6, 1985 hearing).

vember 4, 1985 hearing held, *inter alia*, in connection with the Official Creditors' Committee ("Committee") motion to commence, on its behalf, an adversary proceeding to avoid DAMA's pledge, DAMA's United States counsel, a member of Fox, Glynn & Melamed appeared on the record and stated: "I am John Horan. I have given my card to the reporter. I am appearing for Mr. Soedjono [DAMA], Your Honor." Transcript, Nov. 4, 1985, at 11.

On December 3, 1985, Deak commenced this adversary proceeding against DAMA seeking to set aside the alleged pledge of DAMA as a preference and a fraudulent conveyance. The Committee sought and was granted leave to intervene pursuant to Fed.R.Civ.P. 24(b)(2). On December 5, 1985, DAMA was served with a summons and complaint sent by mail or international courier from New York to his residence in Holland. The parties subsequently entered into a stipulation extending DAMA's time to respond until February 3, 1986. On that date, DAMA filed the present motion to dismiss the complaint pursuant to Fed.R. Civ.P. 12(b)(2) and Bankruptcy Rule 7012. Deak subsequently amended the complaint seeking also to enjoin DAMA from proceeding in its Swiss action.

## II. CONTENTIONS OF THE PARTIES

DAMA claims that this court lacks in personam jurisdiction over him because he has had no contacts of any constitutional significance with the United States. He states that he is a citizen of Indonesia and an occasional resident of Holland and Belgium. He has business interests in Indonesia, but claims to have no business or other interests of any kind in the United States. He further claims that his voluntary filing of a notice of appearance in the Deak case does not constitute consent to jurisdiction for purposes of this adversary proceeding. DAMA points out a) that he is not a Deak creditor, having filed no proof of claim in these proceedings and b) that if he were a creditor, the bar date for filing claims has passed thereby preventing him from being considered a participating creditor.

DAMA also maintains that this court lacks in rem and quasi in rem jurisdiction over the FOCO shares themselves, thereby inferring that disposition of all issues of law relating to those shares must await the outcome of proceedings in the Zurich District Court.

Deak and the Committee contend that DAMA consented and submitted to this court's exercise of personal jurisdiction over him by filing a general notice of appearance in the bankruptcy case and by appearing both on and off the record at various hearings held before this court. Deak and the Committee further claim that this court has in rem and quasi in rem jurisdiction over the proceeds derived from the sale of the FOCO shares which proceeds are now being held in an escrow account at Morgan Guaranty Trust Co. in New York and to which DAMA's purported pledge has attached. These two bases for jurisdiction are set forth in Deak's complaint.

For the following reasons, this court finds that it has in rem jurisdiction over the FOCO shares and the resulting proceeds and in personam jurisdiction over DAMA.

## III. DISCUSSION OF LAW

*A. This Court Has the Necessary Subject Matter and In Rem Jurisdiction to Determine the Validity of the DAMA Pledge.*

The Code specifically provides the district court where a Chapter 11 case is pending with exclusive jurisdiction over all property of the debtor and the estate. *See* 28 U.S.C. § 1334(d) (Supp. II 1984). This jurisdictional grant has been referred to bankruptcy judges under 28 U.S.C. § 157(a) (Supp. II 1984). *See* Standing Order of Referral of Cases to Bankruptcy Judges, July 10, 1984 (S.D.N.Y., Ward, J.). Section 1334(d) provides the subject matter underpinning for this court's jurisdiction in bankruptcy matters; it has been broadly construed consonant with the Code's policy of adjudicating all claims and interests against property of the estate. *See In re*

*Alabama Fuel Sales Co., Inc.,* 45 B.R. 365, 368 (N.D.Ala.1985) (§ 1334(d) gives bankruptcy court jurisdiction over all property of the debtor so long as its Chapter 11 case is pending); *In re Dahlquist,* 53 B.R. 428, 429 (Bankr.D.S.D.1985) (intent of § 1334(d) clearly contemplates "matters involving property of the estate" being adjudicated by the bankruptcy court where the case is filed).

Property of the estate is defined in § 541(a) of the Code to include "all the following property, wherever located and by whomever held: [4] all legal or equitable interests of the debtor in property as of the commencement of the case." This provision derives from § 70(a) of the former Bankruptcy Act of 1898 which provided that the trustee's title extended to property "wherever located." According to the legislative history of § 70(a), Congress inserted this language to "make clear that a trustee in bankruptcy is vested with the title of the bankrupt in property which is located without, as well as within, the United States." H.R.Rep. No. 2320, 82nd Cong., 2d Sess. 15, *reprinted in* 1952 U.S. Code Cong. & Ad.News 1960, 1976.

Section 541 similarly was intended to provide a comprehensive and broad definition of property of the estate. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 367, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6323; S.Rep. No. 989, 95th Cong. 2d Sess. 82, *reprinted in* 1978 U.S. Code Cong. & Ad.News 5787, 5868 ("The debtor's interest in property also includes 'title' to property, which is an interest."). *See also In re Whiting Pools, Inc.,* 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983) ("The House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad. Most important, ... § 541(a)(1) is intended to include in the estate any property made available to the estate by other provisions of the ... Code.") (footnote omitted); *In re Brown,* 734 F.2d 119, 123 (2d Cir.1984) ("The phrase 'all legal or equitable inter-

ests of the debtor in property' [used in § 541(a)(1)] has been given the broadest possible interpretation."); *In re Iler,* 18 B.R. 855, 857 (Bankr.D.Tenn.1982) (Scope of § 541 "is almost limitless under the new Code.") (citing *In re Parker,* 9 B.R. 447, 449 (Bank.M.D.Ga.1981)); *In re Alpa Corp.,* 11 B.R. 281, 287–88 (Bankr.D.Utah 1981) ("[T]he legislative history states that even mere title in the debtor is in itself enough to invoke the jurisdiction of the bankruptcy court under Section 541."). One court has found that the inclusion of foreign property ("wherever located") is part of the estate. *In re National Safe Center, Inc.,* 41 B.R. 195, 196 (Bankr.D.Hi. 1984) (Debtor's estate includes property in the custody of Customs Service even though such property has not entered into the "stream of commerce" and technically is not in the United States.); *In re Filipek,* 35 B.R. 339, 341 (Bankr.D.Hi.1983) (Nondisclosure of foreign assets constitutes a failure to comply with the terms of § 541(a)).

Under § 541(a), the FOCO shares controlled by Deak constituted legal or equitable interests of the debtor as of the commencement of the case and are property of the debtor's estate. Merely because the FOCO shares were located beyond the borders of the United States does not exempt them from this court's jurisdictional interests. This court therefore has the necessary subject matter jurisdiction to assess ownership in the FOCO shares. Moreover, DAMA's purported pledge on 8,000 shares does not change those shares' status as property of the Deak estate.

A pledge is defined as "a bailment of personal property as security for some debt or engagement, redeemable on certain terms, and with an implied power of sale on default." 4 *Collier on Bankruptcy* ¶ 541.-08[9] at 541–55 (15th ed. 1984). In the usual pledge arrangement, the pledgor retains title to the subject matter of the pledge, while the pledgee has possession. The pledgee's interest ripens only upon the

---

**4.** The Bankruptcy Amendments and Federal Judgeship Act of 1984 enlarged the meaning of property of the estate under § 541(a) to include property by "whomever held."

pledgor's default at which time the pledgee may act to perfect his title. Deak retained legal title to the FOCO shares at all times. DAMA's interest would have ripened only upon a default by Deak Macau and subsequent action by DAMA to obtain title. It is unclear, under what circumstances, if any, Deak Macau defaulted, and what steps DAMA has taken to enforce its right against Deak Macau. It is clear though that DAMA never obtained title to the FOCO shares.

Even after Deak's FOCO shares were sold free and clear of all liens, this court retained jurisdiction to decide who was entitled to the proceeds. Because the shares and the resulting proceeds from the sale are considered property of the estate, this court has exclusive jurisdiction over them pursuant to § 1334(d). This court is therefore empowered to assess the validity of DAMA's pledge which has attached to the proceeds of the sale.[5] Nevertheless, in order to bind DAMA, who claims an interest in the FOCO shares, this court must have in personam jurisdiction over him.

### B. This Court Has In Personam Jurisdiction Over DAMA.

■ The standard for determining in personam jurisdiction over an individual alien such as DAMA[6] is that of minimum contacts enunciated in *International Shoe v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). *See In re Fotochrome, Inc.,* 377 F.Supp. 26, 28–29 (E.D.N.Y.1974), *aff'd,* 517 F.2d 512 (2d Cir.1975) (minimum contacts test must be met to exercise jurisdiction in extranational matters). In *International Shoe,* however, the minimum contacts test was applied to a domestic corporation, not an individual alien, and the issue was whether the defendant's contacts were sufficient to satisfy the due process re-

quirement of the Fourteenth Amendment. 326 U.S. at 311, 66 S.Ct. at 156. Nevertheless, the *International Shoe* standard is applicable to both individuals like DAMA and corporations as in *International Shoe. See Bankhead Enterprises, Inc. v. Norfolk and Western Railway, Co.,* 642 F.2d 802, 806 (5th Cir.1981) (citation omitted). It is noted that when federal jurisdiction over an alien is considered, the proper constitutional focus shifts from the due process clause of the Fourteenth Amendment whose concern is a State's exercise of jurisdiction, to that of the Fifth Amendment. *See Mathews v. Diaz,* 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976) (aliens are afforded protection under the Fifth Amendment); *Wong Wing v. United States,* 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896) (same).[7] Both Deak and DAMA agree that *International Shoe* sets forth the appropriate test, but disagree, not suprisingly, on the resulting outcome.

The Court, in *International Shoe,* found that:

> due process requires ... that in order to subject a defendant to judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

326 U.S. at 316, 66 S.Ct. at 158 (citing *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). The Court did not define "minimum contacts," but recognized that the test could not be "simply mechanical or quantitative." *Id.* 326 U.S. at 319, 66 S.Ct. at 159. *See also Kulko v. California Superior Court,* 436

---

5. Such a determination would also be considered a core proceeding under 28 U.S.C. §§ 157(b)(2)(F) and (G) (Supp. II 1984) which allow the bankruptcy court to enter a final order when the complaint involves proceedings to determine, avoid, or recover preferences or fraudulent conveyances. Here the court would have to decide whether the pledge is avoidable as a preference or a fraudulent conveyance.

6. DAMA is properly characterized as an alien because he is neither a U.S. citizen nor national. *See* 8 U.S.C. § 1101(a)(3) (1982).

7. The Fifth Amendment provides that "no person shall be ... deprived of life, liberty, or property without due process of law." The term "person" is considered to include an alien. *Mathews v. Diaz,* 426 U.S. at 77, 96 S.Ct. at 1890.

U.S. 84, 92, 98 S.Ct. 1690, 1697, 56 L.Ed.2d 132 (1978) ("Like any standard that requires a determination of 'reasonableness,' the 'minimum contacts' test of *International Shoe* is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present.") (citing *Hanson v. Denckla*, 357 U.S. 235, 246, 78 S.Ct. 1228, 1235–36, 2 L.Ed.2d 1283 (1958)). In discussing the minimum contacts formulation, the *International Shoe* Court stated that:

> [the due process] clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations.
>
> .  .  .  .  .
>
> But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.

326 U.S. at 319, 66 S.Ct. at 160.

Subsequent cases, which have examined in personam jurisdiction under a variety of factual settings, have reinforced the minimum contacts requirements, relying on numerous factors. *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977) emphasized that "the relationship among the defendant, the forum, and the litigation ... [is] the central concern" in personal jurisdiction inquiries. *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958), stressed the defendant's contacts with the forum and stated that "[t]he application of th[e] [minimum contacts] rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the

defendant purposefully avails itself of the privilege of conducting activities within the forum State." (citations omitted). *See also Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1334 (2d Cir.1972). The "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984).

The *International Shoe* requirement that "traditional notions of fair play and substantial justice" not be offended has also been reinforced. *See Kulko v. California Superior Court*, 436 U.S. at 97, 98 S.Ct. at 1699 ("basic considerations of fairness" emphasized); *Rush v. Savchuk*, 444 U.S. 320, 329, 100 S.Ct. 571, 577, 62 L.Ed.2d 516 (1980) (defendant must engage in "purposeful activity related to the forum that would make the exercise of jurisdiction fair, just, or reasonable"); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 564–65, 62 L.Ed.2d 490 (1980) ("The protection of [non-resident defendants] against inconvenient litigation is typically described in terms of 'reasonableness' or 'fairness' "). The Court is, however, cognizant that "[b]ecause the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Insurance Corporation of Ireland, Ltd. v. Compagnie Des Bauxites de Guinee*, 456 U.S. 694, 703, 102 S.Ct. 2099, 2105, 72 L.Ed.2d 492 (1982). The Court in *Insurance Corporation of Ireland* stated that:

> for various reasons a defendant may be estopped from raising the issue [of personal jurisdiction].... The actions of the defendant may amount to a legal submission to the jurisdiction of the court, whether voluntary or not. The expression of legal rights is often subject to certain procedural rules: The failure to follow those rules may well result in a curtailment of the rights.

*Id.* at 704–05, 102 S.Ct. at 2105.

In the domestic setting of *International Shoe*, the Court has demonstrated a

wariness of allowing one State to intrude upon the sovereignty of another. *See World-Wide Volkswagen v. Woodson*, 444 U.S. at 293, 100 S.Ct. at 565 ("the Framers ... intended that the States retain many essential attributes of sovereignty, including, the sovereign power to try causes in their courts"). In the international context, while the minimum contacts standard has been retained, the emphasis is on the fairness and reasonableness of requiring a defendant to appear in the United States. *See Max Daetwyler Corp. v. Meyer*, 762 F.2d 290, 293 (3d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985) ("The fifth amendment has been construed to impose a general fairness test incorporating *International Shoe's* requirement that 'certain minimum contacts' exist between the nonresident defendant and the forum 'such that maintenance of the suit does not offend traditional notions of fair play and substantial justice.' ") (citations omitted). The court in *Max Daetwyler Corp.*, observed that "[s]everal commentators have noted that the interstate federalism concerns which animate fourteenth amendment due process analysis under *International Shoe* and its progeny are diminished in the fifth amendment context." 762 F.2d at 294 n. 4 (citations omitted). *See also* Lilly, *Jurisdiction over Domestic and Alien Defendants*, 69 Va.L.Rev. 85 (1983). In *Insurance Co. of North America v. Marina Salina Cruz*, 649 F.2d 1266, 1270 (9th Cir.1981), the following factors, originating in *International Shoe* and other Supreme Court decisions, were used to determine the existence of minimum contacts over an alien defendant: a) the extent of the defendant's purposeful interjection into the forum state; b) the burden on the defendant of defending in the forum; c) the extent of conflict with the sovereignty of defendant's state; d) the forum state's interest in adjudicating the dispute; e) the most efficient judicial resolution of the controversy; f) the importance of the forum to plaintiff's interest in convenient and effective relief; and g) the existence of an alternative forum (citations omitted). *See also Taubler v. Giraud*, 655 F.2d 991, 994 (9th Cir.1981) (citing *Marina Salina Cruz* factors with approval).[8]

■ Bankruptcy courts have also applied the minimum contacts test[9] to protect foreign corporations and persons. *See, e.g., In re A & W Publishers, Inc.*, 39 B.R. 666, 667 (S.D.N.Y.1984) ("a minimum contacts test applies in bankruptcy to protect foreign corporations [persons] against being subject to jurisdiction in this country without due process of law"). In the present case an analysis of DAMA's aggregate contacts with the United States and, in particular with New York and this court, using the framework provided by *Marina Salina Cruz*, demonstrates that the minimum contacts test is complied with and that this

---

8. Another major hurdle faced by courts determining jurisdiction over aliens is whether the defendant's aggregate national contacts with the United States or his contacts with the particular state are to be considered. *See e.g., Max Daetwyler Corp.*, 762 F.2d at 293–95 (aggregate national contacts may be appropriate). In the present case, this problem does not arise. First, DAMA's national contacts are appropriately considered a jurisdictional base because the Code provides for nationwide service. *See In re Fotochrome, Inc.*, 377 F.Supp. 26, 28–29 (E.D.N.Y. 1974), *aff'd*, 517 F.2d 512 (2d Cir.1975) (bankruptcy court "though graced with nationwide jurisdiction" is bound by the minimum contacts principle). Second, DAMA's contacts have all been with the State of New York.

9. It is noted that some bankruptcy courts have found, in the domestic setting, that:

the 'minimum contacts' or 'reasonable nexus' theories do not apply in bankruptcy cases since the jurisdictional foundation in such cases is based on a statutory rule designed to reflect that the totality of *in personam* and *in rem* jurisdiction should be exercised by the bankruptcy courts in order to avoid fragmentation of litigation and in furtherance of the spirit of economy in administration of bankruptcy estates.

*In re Schack Glass Industries Co., Inc.*, 20 B.R. 967, 970 (Bankr.S.D.N.Y.1982) (citations omitted). *See also In re Coby Glass Products Co.*, 22 B.R. 961, 963 (Bankr.D.R.I.1982). Because this court finds that DAMA has the requisite minimum contacts with this jurisdiction, *see International Shoe*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), it is unnecessary to rely on these courts' analyses.

court's exercise of in personam jurisdiction over DAMA is warranted.

### 1. *The extent of DAMA's purposeful interjection into the forum state.*

DAMA affirmatively asserted his status as a "party in interest and equity security holder" in the Deak bankruptcy proceedings when he filed his notice of appearance. *See Anderson v. Taylorcraft, Inc.,* 197 F.Supp. 872, 874 (W.D.Pa.1961) ("An appearance is ordinarily an overt act by which a party comes into court and submits himself to its jurisdiction.... It is an affirmative act requiring knowledge of the suit and an intention to appear.") (citation omitted). This court recognizes that DAMA filed notice of appearance in the Deak case pre-dated the institution of this adversary proceeding. However, his appearance is being considered as part of the contact penumbra which DAMA established with this forum. By filing his appearance, he has rendered himself available as a party in interest *to the subsequent issue determination of his asserted interest in the FOCO shares owned by Deak.*

A party in interest classification provides a party with standing to assert an affirmative bundle of rights and privileges under the Code which are acknowledged and respected by the court. *See In re Casco Bay Lines, Inc.,* 14 B.R. 18, 20 n. 2 (B.A.P. 1st Cir.1981) ("[t]he right to appear and be heard on an issue and the right to appeal are rights associated with the status of a 'party in interest' ") (citing § 1109(b)). The term "party in interest" is used throughout the Code and in the Bankruptcy Rules, but is not defined. *See In re Citizens Loan & Thrift Co.,* 7 B.R. 88, 90 (Bankr.N.D.Iowa 1980). Section 1109(b) of the Code provides that "[a] party in interest *including* the debtor, the trustee, a creditor's committee, an equity security holder, or any indenture trustee, may raise and may be heard on any issue in a case under this chapter." (emphasis added). The word "including"

as used in § 1109(b) is not interpreted in a limiting manner and parties other than those listed may come within the meaning of "party in interest." *In re Citizens Loan & Thrift Co.,* 7 B.R. at 90. *See also In re Johns-Manville Corp.,* 36 B.R. 743, 747 (Bankr.S.D.N.Y.1984) ("Section 1109(b) continues the broadening of the concept of party in interest"); *In re UNR Industries, Inc.,* 46 B.R. 671, 675 (Bankr.N.D.Ill.1985) ("Section 1109(b) ... is not restrictive in its enumeration of the parties who may be recognized as parties in interest in a Chapter 11 proceeding.")

Section 1109(b) has been construed to "continue[ ] the pattern of permitting interested parties in bankruptcy cases the absolute right to be heard and to insure fair representation." *In re Amatex Corp.,* 755 F.2d 1034, 1042 (3d Cir.1985). The Code grants a party in interest, *inter alia,* the right to: request termination of a trustee's appointment under § 1105, request conversion of the case from Chapter 11 to Chapter 7 or 13 of the Code under § 1112(b), and request a revocation of an order of confirmation, under § 1144. 5 *Collier on Bankruptcy* ¶ 1109.02 at 1109–23 n. 23 (15th ed. 1985). Moreover, a party deemed a "party in interest" has been considered by some courts to have an unconditional right to intervene similar to Fed.R.Civ.P. 24(a) in any adversary proceeding arising in a chapter 11 case. *In re Marin Motor Oil, Inc.,* 689 F.2d 445 (3d Cir.1982), *cert. denied,* 459 U.S. 1206–07, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983) (party in interest was the creditors' committee); *In re D.H. Sharrer & Son, Inc.,* 44 B.R. 976 (Bankr.M.D.Pa. 1984); *In re Cloud Nine, Ltd.,* 3 B.R. 199 (Bankr.D.N.M.1980). *But cf. In re Fuel Oil Supply & Terminaling v. Gulf Oil Corp.,* 762 F.2d 1283 (5th Cir.1985) (§ 1109(b) does not confer upon a creditors' committee an absolute right to intervene in an adversary proceeding); *In re Terex Corp.,* 53 B.R. 616 (Bankr.N.D.Ohio 1985).[10]

---

**10.** The legislative history of this section indicates that "[r]ules of bankruptcy procedure or court decisions will determine who is a party in interest for the particular purposes of the provision in question." 124 Cong. Rec. S17407 (daily ed. Oct. 6, 1978); 124 Cong. Rec. H11090 (daily

By filing his notice of appearance, DAMA has indicated and, in essence, declared himself to be not only interested in these proceedings but to have acknowledged that his interests are affected. He has requested that this court give express recognition to his status and has purposefully availed himself of the privileges and benefits of conducting judicial activities within the United States. *Hanson v. Denckla*, 357 U.S. at 253, 78 S.Ct. at 1239–40. In this context, DAMA has voluntarily interjected himself into these proceedings and by his presence has indicated his consent to jurisdiction over matters involving him.

Moreover, by accepting the privileges associated with a party in interest status, DAMA also subjected himself to other Code provisions, including § 362, the automatic stay provision of the Code. Deak's filing activated § 362 which prohibits, *inter alia*, the commencement of a judicial action or proceeding against the debtor, any act to obtain possession of property of the estate, and any act to create, perfect or enforce any lien against property of the estate. This stay is designed to protect the debtor's estate from the "chaos and the wasteful depletion resulting from multifold, uncoordinated and possibly conflicting litigation." *In re Frigitemp Corp.*, 8 B.R. 284, 289 (S.D.N.Y.1981). *See also Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47, 55 (2d Cir.1976), *cert. denied*, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977) (the stay "prevent[s] a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts"). DAMA's commencement of the Swiss action subsequent to Deak's filing contravened the letter and spirit of § 362, and is a serious affront to this court's jurisdiction by a party who had already appeared in

this bankruptcy case. It threatens to frustrate and undermine the Code policies of orderly adjudication and distribution of the debtor's estate.[11]

DAMA may have miscalculated by assuming that filing a notice of appearance and characterizing himself as a party in interest and equity security holder would serve only as a convenient, economical means of obtaining papers and notices. DAMA's failure to appreciate the ramifications of claiming this status does not constitute a defense to jurisdiction. Had DAMA deliberately wanted to preserve his immunity from this court's jurisdiction or distance himself from it, he or his attorney could have passively monitored the proceedings and obtained copies of documents from court files which are open to the public. Papers are routinely located and copied for a search and copy fee by court personnel without precondition when requested by any member of the general public. DAMA chose not to avail himself of this latter more anonymous option.

Furthermore, DAMA's appearance at the August 6, 1985 hearing, coupled with his failure to qualify statements made by Deak with regard to DAMA's interest, were further evidence of submission to this court's jurisdiction. Deak stated clearly at the hearing that the DAMA pledge was in dispute and that its validity would be determined at a later date. The present adversary proceeding seeks to determine precisely that matter. Deak further represented that it was "aware of no objection by any of the three lienors with respect to this prong of the application." Transcript, August 6, 1985, at 19. Specifically, Deak sought to have the liens, if their validity was established, to attach to the proceeds of the sale. DAMA had an opportunity but never voiced his objection to this court's

---

ed. Sept. 28, 1978). *See, e.g., In re Comcoach Corp.*, 698 F.2d 571 (2d Cir.1983) (mortgagee bank was not considered a party in interest and could not move to vacate the automatic stay); *In re CO Petro Marketing Group, Inc.*, 680 F.2d 566, 573 n. 12 (9th Cir.1982) (the Commodity Futures Trading Commission was considered a party in interest for the purpose of intervening

to move to dismiss an improperly filed Chapter 11 petition).

11. The debtor, in its amended complaint, sets forth a § 362 cause of action. This aspect of the complaint, however, is not the focus of the present motion to dismiss.

jurisdiction which he easily could have done. Had an objection been interposed by DAMA at this juncture or by the other lienors, this court may well have structured the order it signed allowing the sale to go forward differently. DAMA's silence throughout estops him from now raising the issue of personal jurisdiction; his acts and non-acts have amounted to a legal submission to the jurisdiction of this court. *Insurance Corporation of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. at 704–05, 102 S.Ct. at 2105–06.

Alternatively DAMA's notice of appearance and his regular presence at all key case junctures affecting his interest coupled with his failure to object to jurisdiction almost a year earlier than he did lead to the conclusion that DAMA waived a jurisdictional challenge. *See Durabilt Steel Locker Co. v. Berger Mfg. Co.,* 21 F.2d 139, 140 (N.D.Ohio 1927) ("[w]aiver by an appearance is always a matter of intention, and is not to be inferred, except as the result of acts from which an intent may properly be inferred.").

2. *The burden on DAMA of defending the validity of the pledge in the Bankruptcy Court for the Southern District of New York.*

DAMA has retained New York counsel and has been apprised of pending Deak hearings. DAMA's counsel has been present at numerous hearings when DAMA's interests were discussed and sought to be affected. The logistical burden of requiring DAMA to defend the validity of the pledge in New York would appear slight. Indeed, DAMA's selected forum of Switzerland is neither the state of DAMA's citizenship nor his residence. DAMA, it appears, has only submitted to the jurisdiction of the Swiss court as a reaction to this court's authorization of the sale of the FOCO shares. DAMA has shown a demonstrable ability and willingness to travel and appear in Switzerland and other states which indicates that the burden to him in continuing his appearance

as a self-labeled party in interest in the United States is minimal.

3. *The extent of conflict with the sovereignty of DAMA's state.*

Indonesia, Belgium and Holland represent DAMA's places of citizenship, residence and activity. None of the laws or interests of these states are involved in the present controversy and thus there is no sovereignty conflict with DAMA's state. A sovereignty conflict, if indeed there is one, exists as to which court, either U.S. or Swiss, should determine the validity of the pledge. This court's interest stems from the FOCO shares being considered property of the estate; the Swiss court's interest stems from the shares being physically located in Switzerland. The Swiss district court has already enjoined FOCO from transferring actual possession of, the shares in controversy to Chan, on behalf of Leo. FOCO, however, "has represented that it will not release the DAMA Shares, except upon joint instruction of ... Leo's representative and DAMA or upon order of a court of competent jurisdiction." Affidavit of Jerome C. Roth (counsel to Leo), May 9, 1986, at 8–9. This court's finding of in personam jurisdiction over DAMA and in rem jurisdiction over the shares and proceeds renders it a court of competent jurisdiction and its decree would likely be given felicitous consideration by the Swiss courts.

4. *The forum state's interest in adjudicating the dispute; the most efficient judicial resolution of the controversy; the importance of the forum to Deak's interest in convenient and effective relief.*

This court has a substantial interest in adjudicating the validity of DAMA's pledge in order that all facets of the Deak reorganization may be consistently decided and all creditors treated fairly. Not only does this court have subject matter jurisdiction over the shares and the proceeds resulting therefrom, but a mechanism was created at the August 6th hearing so that once the

validity of the disputed pledges was determined, those interests would be satisfied from the proceeds of the sale. At the hearing, this mechanism was discussed and none of the holders of three disputed pledges raised objections.

The United States and Switzerland may both arguably have reasonable bases for exercising jurisdiction, but § 403(3) of the Restatement (Revised) of the Foreign Relations Law of the United States (Tent.Draft No. 7, April 10, 1986) calls for an evaluation by each state of its interest in exercising jurisdiction. If one state has a clearly greater interest in exercising jurisdiction, the other state should defer to it. *Id. See also* Comment e to § 403. In the present case, the United States clearly has a greater interest in exercising jurisdiction as discussed below, so that this court may render complete determinations of all claims of parties in interest in these proceedings. Due process is not violated; piecemeal litigation is avoided; and DAMA will not be treated unfairly. Nowhere has it been shown that the Swiss District Court has a greater interest in the dispute over the FOCO shares.

Even if the Swiss court decided the validity of the pledge, it would be adjudicating only a fragment of a larger dispute and further litigation regarding the pledge, the proceeds of sale, and the escrow agreement will be required in the United States. Because DAMA sought and obtained the Swiss injunction, Deak and Chan, on behalf of Leo, entered into an escrow agreement and placed funds representing the value of the 8,000 FOCO shares in escrow with Morgan Guaranty in New York. The Creditors Committee has commenced an adversary proceeding against Leo and Deak challenging the validity of the escrow arrangement. This adversary proceeding is interrelated with the present proceeding and the two have been procedurally consolidated pursuant to Fed.R.Civ.P. 42(a). *See* Transcript, May 13, 1986, at 16 (this court ruled that consolidation of these adversary proceedings was appropriate). The outcome of the validity of the DAMA pledge has a definite impact on this other proceeding, and only this court is equipped to determine both proceedings. This court would clearly provide the most efficient resolution of all affected interests. The possibility, from DAMA's perspective, that his claims will be accorded better treatment under Swiss laws is irrelevant to the finding that this court has jurisdiction.

### 5. *The existence of an alternative forum.*

An alternative forum does exist but the district court in Switzerland, would adjudicate only a narrow issue, and further litigation would be required. Moreover, this court's determination of the matter would not impermissibly impinge upon the sovereignty of the Swiss court.

### 6. *Fairness and reasonableness considerations support this court's exercise of in personam jurisdiction.*

DAMA's aggregate contacts with this forum support a finding of in personam jurisdiction and comport with the "fair play and substantial justice" requirements of *International Shoe.* DAMA voluntarily filed a notice of appearance in the Deak reorganization proceedings. At the hearing on the sale of the FOCO shares, DAMA was put on notice, if it did not already have such notice, that Deak disputed the DAMA pledge and would challenge the pledge's validity in a subsequent proceeding. DAMA raised no objection to this court's entry of a dispository order relating to the shares. Moreover, DAMA's contacts with this court, throughout the Deak reorganization, have related specifically to the pending adversary proceeding. Fairness and reasonableness considerations dictate that DAMA's aggregate contacts, including his silence, amounted to a submission to jurisdiction.[12] DAMA's motion to dismiss

---

12. This court's finding that it has both in personam and in rem jurisdiction, coupled with the fact that the underlying cause of action here is not only related to the property but arises out of it, obviates consideration of the applicability of quasi in rem jurisdiction concepts here. Quasi

is simply an attempt to move to a forum which he considers more congenial. Yet fairness indicates that this forum is most appropriate because complete relief can be accorded to all of the parties.

## IV. CONCLUSION

For the reasons stated, this court finds that it has in rem jurisdiction over DAMA's claim to the FOCO shares and to his interest in the proceeds generated by the sale and in personam jurisdiction over DAMA. DAMA's motion to dismiss is hereby denied, and he is directed to serve and file an answer within ten days from the date of entry of this decision and order.

It is SO ORDERED.

in rem concepts permit a court to exercise jurisdiction over a person based upon the presence of his property in the forum state, provided he

has minimum contacts with the forum. *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1972).